Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Frank Tiscione, Esq.
Melissa D. Medilien, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY          Docket No.:              (   )
COMPANY,

                                    Plaintiffs,          **Plaintiff Demands**
                                                         **a Trial by Jury**

                    -against-

ROSS A. FIALKOV D.C.,
ROSS A. FIALKOV, D.C., P.C.,
RF CHIROPRACTIC IMAGING, P.C.,
SOUTH SHORE CHIROPRACTIC WELLNESS, P.C.,
CROSSTOWN CHIROPRACTIC, P.C.,
RAF SPORTS CHIROPRACTIC, P.C.,
HEALTHY BIG APPLE CHIROPRACTIC, P.C., AND
JOHN DOE DEFENDANTS "1" - "10",

                                    Defendants.
---------------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, Ross A. Fialkov D.C., Ross A

Fialkov D.C., P.C., RF Chiropractic Imaging, P.C., South Shore Chiropractic Wellness, P.C., Crosstown Chiropractic, P.C., RAF Sports Chiropractic, P.C., Healthy Big Apple Chiropractic, P.C., and John Doe Defendants "1" through "10" (collectively, the "Defendants") hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $612,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including bogus patient examinations, pain fiber nerve conduction studies ("PfNCS"), neuromuscular re-education, and chiropractic manipulations (collectively the "Fraudulent Services"), which were allegedly provided to New York automobile accident victims insured by GEICO ("Insureds") and other insurers.

2.      Defendant, Ross A. Fialkov D.C. ("Fialkov"), is a chiropractor who purports to own a series of chiropractic professional corporations and sole proprietorships, including Defendants Ross A. Fialkov D.C., P.C. ("Fialkov, PC"), RF Chiropractic Imaging, P.C. ("RF Chiro"), South Shore Chiropractic Wellness, P.C. ("South Shore Chiro"), Crosstown Chiropractic, P.C. ("Crosstown Chiro"), RAF Sports Chiropractic, P.C. ("RAF Chiro"), Healthy Big Apple Chiropractic, P.C. ("Healthy Big Apple Chiro"), and Ross A. Fialkov, D.C. (the "Unincorporated Fialkov Practice") (collectively, the "Provider Defendants"), that have billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services. The Provider Defendants purported to be legitimate professional corporations, but operated on a transient basis, maintained no stand-alone practices, had no patients of their own, and provided no legitimate or medically necessary services.

3.      Fialkov, along with John Doe Defendants "1"-"10", perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit the Provider Defendants to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's "No Fault" insurance system for financial gain without regard to genuine patient care.

4.      GEICO seeks to recover the monies stolen from it and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $3,800,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Provider Defendants because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)   the Fraudulent Services were provided – to the extent provided at all – through the use of illegal kickbacks paid in exchange for patient referrals; and

(iv)    in many cases, the Fraudulent Services - to the extent provided at all - were provided by independent contractors, rather than by employees of the Provider Defendants, and therefore were unreimbursable.

5.      The Defendants fall into the following categories:

(i)     Defendant Fialkov is a chiropractor licensed to practice chiropractic in New York and Florida, who purports to own the Provider Defendants, and who purported to perform some of the Fraudulent Services;

(ii)    Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro, Healthy Big Apple Chiro, and the Unincorporated Fialkov Practice are a series of New York chiropractic professional corporations and sole proprietorships through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

      (iii)    John Doe Defendants "1"-"10" are individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and employing pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.      As discussed herein, Defendants, at all relevant times, have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent that they were provided at all – through the use of illegal kickbacks paid in exchange for patient referrals; and (iv) in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Fialkov or the Provider Defendants.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

8.      The charts annexed hereto as Exhibits "1"–"7" set forth a representative sample of fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

9.      The Defendants' fraudulent scheme began as early as 2017 and has continued uninterrupted through the present day, as the Provider Defendants continue to seek collection on pending charges for the Fraudulent Services.

10.     As a result of the Defendants' scheme, GEICO has incurred damages of more than $612,000.00.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

12.     Defendant Fialkov resides in and is a citizen of New York. Fialkov was licensed to practice chiropractic in Florida on or about July 14, 2014 and in New York on or about May 28, 2014.  Fialkov's license to practice chiropractic in Florida previously lapsed, however, it appears to have since been reinstated.

13.     Fialkov serves as the nominal or "paper" owner of the Provider Defendants.  In addition, Fialkov and John Doe Defendants "1"-"10"  have submitted fraudulent billing to GEICO through the Unincorporated Fialkov Practice.

14.     Defendant Fialkov, PC is a New York chiropractic professional corporation incorporated on or about August 9, 2017, with its principal place of business in New York, and purports to be owned and controlled by Fialkov.

15.     Fialkov, PC has been used by Fialkov and John Doe Defendants "1"-"10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

16.     Defendant RF Chiro is a New York chiropractic professional corporation incorporated on or about August 9, 2017 with its principal place of business in New York, and purports to be owned and controlled by Fialkov.

17.     RF Chiro has been used by Fialkov and John Doe Defendants "1"-"10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

18.     Defendant South Shore Chiro is a New York chiropractic professional corporation incorporated on or about March 11, 2019 with its principal place of business in New York, and purports to be owned by Fialkov.

19.     South Shore Chiro has been used by Fialkov and John Doe Defendants "1"-"10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

20.     Defendant Crosstown Chiro is a New York chiropractic professional corporation incorporated on or about June 5, 2019, with its principal place of business in New York, and purports to be owned and controlled by Fialkov.

21.     Crosstown Chiro has been used by Fialkov and John Doe Defendants "1"-"10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

22.     Defendant RAF Chiro is a New York chiropractic professional corporation incorporated on or about April 19, 2019, with its principal place of business in New York, and purports to be owned and controlled by Fialkov.

23.     RAF Chiro has been used by Fialkov and John Doe Defendants "1"-"10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

24.     Defendant Healthy Big Apple Chiro is a New York chiropractic professional corporation incorporated on or about May 11, 2020, with its principal place of business in New York, and purports to be owned and controlled by Fialkov.

25.     Healthy Big Apple Chiro has been used by Fialkov and John Doe Defendants "1"-"10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

26.     Upon information and belief, John Doe Defendants "1"-"10" reside in and are residents of New York.   John Doe Defendants "1"-"10" are unlicensed, non-professional individuals and entities, presently not identifiable, who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

28.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

29.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## <u>ALLEGATIONS COMMON TO ALL CLAIMS</u>

30.     GEICO underwrites automobile insurance in New York.

**I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

31.     New York's "No-Fault" insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, <u>et</u> <u>seq</u>.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, <u>et</u> <u>seq</u>.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

32.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

33.     In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

34.     In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, in New York a healthcare services provider may submit claims using the Health Care Financing Administration claim form (known as the "HCFA-1500 form").

35.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

36.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

37.     In New York, only a licensed chiropractor may practice chiropractic, may own and control a professional corporation authorized to practice chiropractic and, absent statutory exceptions not applicable in this case, may derive economic benefit from chiropractic services. Unlicensed individuals in New York may not practice chiropractic, may not own or control a professional corporation authorized to practice chiropractic, may not employ or supervise chiropractors or physicians, and absent statutory exceptions not applicable in this case, may not derive economic benefit from chiropractic services.

38.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

39.     New York law prohibits unlicensed persons not authorized to practice chiropractic, from practicing the profession and from sharing in the fees for professional services. <u>See</u> <u>e.g.</u>, New York Education Law §6512, §6530 (11), and (19).

40.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically

identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

41.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered or allows unlicensed laypersons to share in the fees for the professional services.

42.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

43.     In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 2019 N.Y. Slip Op. 04643 (June 11, 2019) the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

44.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits.  There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

45.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

46.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

47.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

48.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.  Overview of the Scheme

49.     Beginning in or about 2017, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which Fialkov and the Provider

Defendants were used to bill GEICO and New York automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services.

50.     The Fraudulent Services billed through Fialkov and the Provider Defendants were not medically necessary and were provided - to the extent that they were provided at all - pursuant to fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render healthcare services.

51.     Fialkov did not operate the Provider Defendants at any single, fixed location.

52.     Fialkov and the Provider Defendants did not have their own patients.

53.     Fialkov did not market the existence of the Provider Defendants to the general public and has only recently set up a webpage listing the names of only two of the Provider Defendants.

54.     Fialkov did not legitimately advertise for patients, never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of any of the Provider Defendants.

55.     Fialkov did virtually nothing that would be expected of the owner of legitimate chiropractic professional corporations to develop their reputation and attract patients.

56.     Fialkov, instead, operated the Provider Defendants on an itinerant basis from various "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and Bronx, where the Provider Defendants received steady volumes of patients through no efforts of their own, including at the following clinics (collectively, the "Clinics"):

- 1336 Utica Avenue, Brooklyn;
- 148-21 Jamaica Avenue, Jamaica;
- 1568 Ralph Avenue, Brooklyn;
- 175 Fulton Avenue 503M, Hempstead;
- 180-09 Jamaica Avenue, Jamaica;
- 1835 Bay Ridge Parkway, Brooklyn;

- 1849 Utica Avenue, Brooklyn;
- 227A East 105 Street, New York;
- 2363 Ralph Avenue, Brooklyn;
- 2451 East Tremont Avenue, Bronx;
- 2488 Grand Concourse Suite 424, Bronx;
- 2598 3rd Avenue, Bronx;
- 3041 Avenue U, Brooklyn;
- 3209 Fulton Street, Brooklyn;
- 332 East 149th Street Suite 200, Bronx;
- 3432 East Tremont Avenue, Bronx;
- 360 West Merrick Road, Valley Stream;
- 3910 Church Avenue, Brooklyn;
- 4014A Boston Road, Bronx;
- 4250 White Plains Road, Bronx;
- 430 West Merrick Road, Valley Stream;
- 546 Howard Avenue, Brooklyn;
- 55 East 115th Street, New York;
- 550 Remsen Avenue, Brooklyn;
- 55 West 115th Street, New York;
- 60 Belmont Avenue, Brooklyn;
- 625 East Fordham Road, Bronx;
- 632 Nostrand Avenue, Brooklyn;
- 6937 Myrtle Avenue, Glendale;
- 788 Southern Boulevard, Bronx;
- 80-12 Jamaica Avenue, Jamaica;
- 8255 Queens Boulevard Suite1A, Elmhurst;
- 8655 Broadway Street, Elmhurst;
- 92-08 Jamaica Avenue, Woodhaven;
- 97-01 101 Avenue, Ozone Park;
- 420 Doughty Boulevard, Inwood;
- 3027 Avenue V, Brooklyn;
- 220-01 Jamaica Avenue, Queens Village;
- 127 Post Avenue, Westbury;
- 85-55 Little Neck Parkway, Floral Park;
- 227A East 105th Street, New York;
- 788 Southern Boulevard, Bronx;
- 828 Utica Avenue, Brooklyn;
- 135-25 79th Street, Howard Beach;
- 1674 East 22nd Street 2nd Floor, Brooklyn;
- 108 Kenilworth Avenue, Brooklyn;
- 3491 3rd Avenue, Bronx;
- 172-17 Jamaica Avenue, Jamaica;
- 535 Utica Avenue, Brooklyn;
- 204-12 Hillside Avenue, Hollis;

- 2920 Avenue R Suite 285, Brooklyn;
- 4226 3rd Avenue, Bronx;
- 4009 Church Avenue, Brooklyn;
- 225-21 Linden Boulevard, Cambria Heights;
- 8225 Queens Boulevard Suite 1A, Elmhurst;
- 1500 Astor Avenue Suite 2B, Bronx;
- 665 Pelham Parkway North Suite 2C, Bronx;
- 3306 88th Street Suite 202, Jackson Height;
- 9801 Foster Avenue, Brooklyn;
- 332 East 149th Street Suite 200, Bronx.
- 1100 Pelham Avenue, Bronx;
- 1120 Morris Park Avenue, Bronx; and
- 1320 Louis Nine Boulevard, Bronx.

57.     Fialkov had no genuine chiropractor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with Fialkov or the Provider Defendants.

58.     The Insureds that were subjected to services by Fialkov and the Provider Defendants, to the extent any actual services were provided, were simply directed by the Clinics to subject themselves to treatment by whatever chiropractor was working at the Clinic that day, regardless of whether there was any legitimate need for chiropractic services.

**B.      The Illegal Kickback and Referral Relationships at the Clinics**

59.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

60.     The Clinics provided facilities for the Provider Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

61.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of suspect healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

62.     For example, GEICO received billing for purported healthcare services rendered at the clinic located at 550 Remsen Avenue, Brooklyn from a "revolving door" of more than 100 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including Supreme Health Chiropractic, PC, Shashek Chiropractic, PC, Pro-Align Chiropractic, PC, Pro Edge Chiropractic, PC, Remedy Chiropractic, PC, Sun Chiropractic Services, PC, Morris Park Chiropractic PLLC, Attentive Chiropractic Wellness, PC, Direct Chiropractic Care, PC, JB Chiropractic Services, PC, Pro Adjust Chiropractic, PC, Brook Chiropractic of NY, PC, and billing from Fialkov's chiropractic professional corporation, Crosstown Chiro.

63.     Similarly, GEICO received billing for purported healthcare services rendered at the clinic located at 665 Pelham Parkway, Bronx from a "revolving door" of more than 75 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including Supreme Health Chiropractic, PC, Shashek Chiropractic, PC, Seasoned Chiropractic, PC, Advanced Chiropractic Care, PC, Axis Chiropractic Care, PC, Albis Chiropractic Care, PC, BMJ Chiropractic, PC, Remedy Chiropractic, PC, JTK Chiropractic Care, PC, Narra Chiropractic, PC, Direct

Chiropractic Care, PC, JB Chiropractic Services, PC, PC, Patriot Chiropractic, PC, and billing from Fialkov's chiropractic professional corporation, Crosstown Chiro.

64.     Similarly, GEICO received billing for purported healthcare services rendered at the clinic located at 1500 Astor Place, Bronx, from a "revolving door" of more than 60 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than ten different chiropractic "names", including 21 Century Chiropractic Care, PC, Brefni Chiropractic Diagnostics, PC, Supreme Health Chiropractic, PC, Chiropractic Quality Care, PC, Future Chiropractic Care, PC, Direct Chiropractic Care, PC, JB Chiropractic Services, PC, Patriot Chiropractic, PC, and billing from Fialkov's chiropractic professional corporation, Fialkov, PC.

65.     Similarly, GEICO received billing for purported healthcare services rendered at the clinic located at 1568 Ralph Avenue, Brooklyn, from a "revolving door" of more than 60 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including 21 Century Chiropractic Care, PC, Archer Lewis Chiropractic, PC, BLVD Chiropractic NY, PC, Brook Chiropractic, PC, Compass Chiropractic of NY, PC, Dos Manos Chiropractic, PC, GC Chiropractic, PC, M Chiropractic, PC, and from Fialkov's chiropractic professional corporation, RF Chiro.

66.     Similarly, GEICO received billing for purported healthcare services rendered at the clinic located at 430 West Merrick Boulevard, Valley Stream, from a "revolving door" of more than 60 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than ten different chiropractic "names," including Di-Tech Chiropractic, PC, Dolphin Chiropractic, PC, Integrated Chiropractic

PC, Saints Chiropractic of NY, PC, NYC Care Chiro, PC, and from Fialkov's chiropractic professional corporations, Crosstown Chiro and RF Chiro.

67.     Similarly, GEICO received billing for purported healthcare services rendered at the 3910 Church Avenue, Brooklyn Clinic from a "revolving door" of more than 100 purportedly different healthcare providers.  In fact, many of the medical providers at that location were named as defendants in a federal RICO action where GEICO credibly alleged that the location was owned and controlled by laypersons and the medical providers performed medically unnecessary services based on the improper financial (and other) relationships among the defendants and laypersons.  See Government Employees Insurance Co., et al., v. East Flatbush Medical, P.C., et al., 20-CV-1695 (MKB)(PK).

68.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base and the provision of healthcare services at the Clinics.

69.     For example, a physician who worked at the 3910 Church Avenue, Brooklyn Clinic stated under oath that he ended his involvement with this Clinic because of, among other things, (i) his concern about the manner in which patients were brought to the Clinic; (ii) the manner in which the Clinic was operated; (iii) the use of his signature stamp without his consent; and (iv) the submission of billing for services through his personal tax identification number without his consent.

70.     As a further example, at chiropractor who worked at the 625 East Fordham Road, Bronx Clinic stated under oath that (i) the clinic was owned by three brothers who were neither doctors nor licensed medical professionals; (ii) the brothers advised him that they actually owned the medical professional corporation that was the leaseholder at the location even though none of the brothers were not doctors; and (iii) prescriptions for durable medical equipment that contained the

chiropractor's name were not signed by the chiropractor nor authorized by him, and were issued without his knowledge and consent.

71.     As a further example, at physician who worked at multiple Clinics, including the 180-09 Jamaica Avenue, Jamaica Clinic, stated under oath that: (i) as a condition of employment she was required to prescribe topical pain creams to no-fault patients on a protocol basis; (ii) the front desk personnel at the Clinics became upset if she did not issue prescriptions or refer patients for physical therapy, or if she wanted to discharge a patient from care; and (iii) certain prescriptions that were purportedly authorized by her and submitted to GEICO were done without her knowledge or authorization.

72.     As a further example, at physician who worked at multiple Clinics, including the 227A East 105 Street, New York Clinic, stated under oath that (i) two unlicensed laypersons actually owned the medical professional corporation that operated under his name at that Clinic; (ii) one of the laypersons maintained complete control over the operations of the Clinic, including dictating the treatment that each patient would receive; and (iii) checks written out of a corporate bank account that bore his purported signature were forged.

73.     As a further example, at the 550 Remsen Avenue, Brooklyn Clinic, a physician that who had purportedly worked at many locations including 550 Remsen Avenue attested to the fact that medical services submitted to GEICO, including PfNCS testing, were never provided or authorized, confirming that the treatment was not rendered even though GEICO received billing for this test.

74.     In addition, one of the physicians who worked at the 1500 Astor Avenue, Bronx Clinic stated under oath that the "non-professional staff at the location . . . was controlling the day to day operations."

75.     Fialkov, in order to obtain access to the Clinics' patient base (i.e., Insureds), entered into illegal financial arrangements with unlicensed persons including John Doe Defendants "1"- "10", who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics.  These were "pay-to-play" arrangements made in order to steer Insureds to the Provider Defendants for medically unnecessary services at the Clinics.

76.     In some instances, the Defendants disguised the pay-to-play arrangements, or kickback payments, by having Fialkov and the Provider Defendants pay entities that purported to provide legitimate business services, but actually did not, and instead were used as vehicles to conceal payments made in return for the steering of patients to Fialkov and the Provider Defendants at the Clinics.

77.     For example, Fialkov paid more than $100,000 from RF Chiro's corporate account to BPNT Corp ("BPNT"), which had no actual business operations.

78.     BPNT is owned by Artur Sattarov, who was recently indicted for bank fraud, money laundering, and conspiracy to operate an unlicensed money transmitting business. See USA v. Rasulov, et al., 1:20-cr-00653-RA (SDNY 2020).

79.     As a further example, Fialkov paid monies from Fialkov, PC's corporate account to a purported billing company that had no actual business operations but existed only to siphon away the profits of Fialkov, PC and launder the monies into cash used to pay kickbacks.

80.     In other instances, the Defendants disguised the payments of the kickbacks as being part of ostensible "lease" agreements with the operators of the Clinic Locations.

81.     In fact, Fialkov's alleged "rent" payments to the operators of the Clinic locations were often not consistent with the purported rental arrangements and were made without Fialkov actually knowing what legal relationship the recipients of the payments had with respect to the

properties that housed the Clinics or what authority they had to sublease a portion of the property to him and/or the Provider Defendants.

82.     Fialkov and the other Defendants made the various kickback payments in exchange for having Insureds referred to one or more of the Provider Defendants for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

83.     The amount of the kickbacks paid by the Defendants generally was based on the volume of Insureds that were steered to the Provider Defendants for the purported medically unnecessary services.

84.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme.  The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

85.     Fialkov at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

86.     Fialkov's efforts to conceal the fraudulent scheme included incorporating a series of chiropractic professional corporations, and splitting the Defendants' billing for the Fraudulent Services across the various chiropractic professional corporations and sole proprietorships in order to limit the amount of billing and type of services being submitted under the name of any one PC Defendant.

87.     Fialkov and the other Defendants conducted their scheme through multiple chiropractic professional corporations and sole proprietorships using different tax identification numbers -- including Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro,

Healthy Big Apple Chiro, and the Unincorporated Fialkov Practice -- in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

88.     The Provider Defendants operating under Fialkov's name often rendered the same or similar services as the other Provider Defendants and sometimes operated from the same locations as well, without any legitimate business reason for doing so except to conceal the scheme and continue the fraudulent billing to GEICO and other insurers.

### C.     The Defendants' Fraudulent Treatment and Billing Protocol

89.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

90.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

91.     No legitimate chiropractor or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

92.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

### 1.     The Fraudulent Charges for Purported Examinations

93.     Upon receiving an illegal referral pursuant to kickbacks paid to the owners, operators, and/or medical professionals that operated from the Clinics, the Defendants purported to provide most of the Insureds in the claims identified in Exhibits "1"-"3" and "5"-"7" with an initial chiropractic examination.

94.     In keeping with the fact that the initial chiropractic examinations were performed pursuant to the kickbacks that were paid at the Clinics, Defendants, Fialkov, PC, RF Chiro, RAF Chiro, South Shore Chiro, Healthy Big Apple Chiro, and the Unincorporated Practice virtually always purported to perform the initial chiropractic examinations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

95.     The initial chiropractic examinations were performed as a "gateway" in order to provide Insureds with an excessive number of phony, pre-determined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise unreimbursable, PfNCS and in-office chiropractic treatment.

96.     Typically, either Fialkov or someone associated with the Defendants purported to perform the initial chiropractic examinations, which were billed to GEICO through Fialkov or one of the Provider Defendants.

97.     The Defendants virtually always billed the initial chiropractic examinations to GEICO under current procedural terminology ("CPT") codes 99202 and 99203.

98.     The Provider Defendants typically billed GEICO $42.02 for purported initial chiropractic examinations under CPT code 99202 and $54.74 or $75.00 for purported initial chiropractic examinations under CPT code 99203.

99.     The charges for the initial chiropractic examinations were fraudulent in that the initial chiropractic examinations were medically unnecessary and were performed pursuant to the

kickbacks that the Defendants paid at the Clinics in coordination with the John Doe Defendants "1"-"10", not to treat or otherwise benefit the Insureds.

100.    Furthermore, the charges for the initial chiropractic examinations under CPT codes 99202 and 99203 were fraudulent in that they misrepresented the extent of the initial chiropractic examinations.

101.    For example, in every claim identified in Exhibits "1"-"3" and "5"-"7" for initial chiropractic examinations under CPT codes 99202 and 99203, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor spent with the Insureds or the Insureds' families.

102.    In keeping with the fact that the initial chiropractic examinations misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor spent with the Insureds or the Insureds' families, Fialkov and the Provider Defendants used checklist forms in purporting to conduct the initial chiropractic examinations.

103.    The checklist forms that Fialkov and the Provider Defendants used in conducting the initial chiropractic examinations set forth a limited range of potential patient complaints examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

104.    All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds, which does not justify the billing under CPT codes 99202 and 99203 for virtually every patient.

105.    In addition, pursuant to the Fee Schedule, when the Defendants submitted charges for initial chiropractic examinations under CPT code 99203, or caused them to be submitted, they falsely represented that Fialkov or a chiropractor associated with one of the Provider Defendants (i) took a "detailed" patient history; and (ii) conducted a "detailed" physical examination.

106.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the NY Fee Schedule, a "detailed" patient history requires – among other things – that the examining physician or chiropractor take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

107.    However, in the claims for initial chiropractic examinations identified in Exhibits "1"-"3" and "5"-"7", the Defendants, never took a "detailed" patient history from Insureds during the initial chiropractic examinations, inasmuch as they did not take a history of systems related to the patient's presenting problems and did not conduct any review of a limited number of additional systems.

108.    Rather, after purporting to provide the initial chiropractic examinations, the Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

109.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

110.    Moreover, pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

111.    To the extent that the Insureds in the claims identified in Exhibits "1"-"3" and "5"-"7" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints.

112.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to the following:

 (i)  measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

 (ii)  general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

 (iii)  examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

 (iv)  palpation of lymph nodes in neck, axillae, groin and/or other location;

 (v)  brief assessment of mental status;

 (vi)  examination of gait and station;

 (vii)  inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

 (viii)  coordination;

 (ix)  examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

 (x)  examination of sensation.

113.     In the claims for initial examinations in Exhibits "1"-"3" and "5"-"7" in which Fialkov and the Provider Defendants billed for the initial examinations under CPT code 99203, they falsely represented that Fialkov, a series of treating chiropractors (the "Treating Chiropractors") or some other healthcare provider associated with the Provider Defendants conducted a "detailed" patient examination of the Insureds they purported to treat during the initial examinations.

114.    In fact, neither Fialkov, the Treating Chiropractors, nor any other healthcare services provider associated with the Provider Defendants even conducted a "detailed" patient examination of the Insureds, inasmuch as they did not conduct an extended examination of the Insureds' affected body areas and other symptomatic or related organ systems.

115.    For example, in the claims for initial examinations identified in Exhibits "1"-"3" and "5"-"7" neither Fialkov, the Treating Chiropractors, nor any other healthcare services provider associated with the Provider Defendants ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)     examination of sensation.

116.    In the claims for initial chiropractic examinations in Exhibits "1"-"3" and "5"-"7" in which the Defendants billed for the initial chiropractic examinations under CPT code 99203, the Defendants falsely represented that the Defendants conducted a "detailed" patient examination of the Insureds they purported to treat during the initial chiropractic examinations.

117.    In fact, the Defendants never conducted a "detailed" patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

118.    In addition to the fraudulent initial chiropractic examinations, the Provider Defendants purported to subject the Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

119.    The Defendants typically billed the follow-up examinations to GEICO under CPT code 99212.

120.    Like the Defendants' charges for the initial chiropractic examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the Defendants' fraudulent treatment protocol and the kickbacks that the Defendants paid at the Clinics, not to treat or otherwise benefit the Insureds.

**2.      The Fraudulent Charges for Electrodiagnostic Testing by the Provider Defendants**

121.    As set forth in Exhibits "1"-"7", based upon the fraudulent, predetermined "diagnoses" provided during the initial examinations, the Defendants also purported to subject many Insureds to a series of medically unnecessary and useless PfNCS tests billed through the Provider Defendants.

122.    The charges for the PfNCS tests were fraudulent in that the PfNCS tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' fraudulent treatment protocol and the kickbacks that Fialkov and the Provider Defendants paid at the Clinics, not to treat or otherwise benefit the Insureds.

### a.    The Human Nervous System and Electrodiagnostic Testing

123.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

124.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

125.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

126.    The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

127.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

128.    PfNCS tests are purportedly a form of electrodiagnostic testing, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

129.    The American Association of Neuromuscular and sElectrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

130.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

131.    The Recommended Policy does not identify PfNCS tests as having any documented utility in diagnosing radiculopathies.  In fact, PfNCS tests are not recognized as having any value in the diagnosis of any medical condition.

### b.    The Fraudulent PfNCS Tests

132.    As part of the fraudulent treatment protocol and kickback scheme, the Defendants purported to subject Insureds to medically unnecessary PfNCS tests.

133.    The charges for the PfNCS tests were fraudulent in that the PfNCS tests were medically unnecessary and performed, not to treat or otherwise benefit the Insureds, but instead pursuant to the Defendants' predetermined treatment protocol and improper financial and referral arrangements between the Defendants and others.

134.    The Defendants billed the PfNCS tests to GEICO through the Provider Defendants as multiple charges under CPT codes 95999 and 95904 generally resulting in multiple charges of more than $1,000.00 for each Insured on whom the PfNCS testing purportedly was performed.

### (i)    Legitimate Tools for Radiculopathy Diagnosis

135.    The Defendants supposedly provided the PfNCS test to Insureds in order to diagnose radiculopathies, which are a type of neuropathy.

136.    There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and in the nerve roots (i.e., radiculopathies).  These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging tests ("MRIs").

137.    MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body.  MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through the images of the nerves, nerve roots, and surrounding areas.

### (ii)    The Medically Useless PfNCS Tests

138.    The PfNCS "test" is a type of sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots.  It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

139.    The PfNCS tests are performed by administering an electrical stimulus at specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face.  The voltage is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage.  "Findings" then are made by comparing the minimum voltage stimulus required for

the patient to announce that he or she perceives some sensation from it with purported normal ranges.

140.   If the patient's sensation threshold is greater than the purported normal range of voltage required to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function).  If the voltage required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

141.   In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in PfNCS testing.

142.   Specifically, there is no reliable evidence of the existence of normal ranges of intensity or voltage required to evoke a sensation using a PfNCS test device.  Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal PfNCS test results are normal or abnormal.

143.   Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a PfNCS test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that a sensation threshold less than the normal range would indicate a hyperesthetic condition.

144.   Similarly, even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from PfNCS tests.  Indeed, numerous pathological and physiological conditions other than peripheral nerve damage can cause hyperesthesia and hypoesthesia.

145.     Furthermore, even if PfNCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

(i)      no reliable evidence proves that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

(ii)     no reliable evidence proves that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

(iii)    no reliable evidence proves that any such information would indicate the specific location of the abnormality along the sensory nerve pathways; and

(iv)     PfNCS tests do not provide any information regarding the motor nerves or motor nerve roots, which are as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident.

146.   Simply put, no legitimate medical evidence supports the conclusion that PfNCS tests are in any way useful, let alone medically necessary, to diagnose neuropathies in general or radiculopathies in particular.

147.   Notably, the Centers for Medicare & Medicaid Services ("CMS") have determined that PfNCS tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and radiculopathies, and therefore are not compensable.

148.   In keeping with the fact that the Defendants' putative PfNCS tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for PfNCS tests.

149.   In keeping with the fact that the Defendants' purported PfNCS tests were medically useless, the putative "results" of the Defendants' PfNCS tests were not incorporated into any Insured's treatment plan, and the PfNCS tests played no genuine role in the treatment or care of the Insureds.

> **(iii)    Each of the Two Main PfNCS Test Device Manufacturers Claims the Other is a Fraud**

150.    Until 2004, about the same time that CMS was considering the medical benefits of PfNCS testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of PfNCS tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

151.    Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

152.    In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

153.    Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

154.    Neuro Diagnostic Associates, Inc. claims that the Neurometer does not produce valid data or results and has been fraudulently marketed.  For its part, Neurotron Inc. has asserted the same claims regarding Neuro Diagnostic Associates, Inc.'s Medi-Dx 7000/Axon-II.

155.    Upon information and belief, the Defendants utilized either a Neurometer or Axon-II to perform PfNCS testing on Insureds.

> **c.    Defendants' Medically Unnecessary PfNCS Tests**

156.    Pursuant to their pre-determined treatment protocol and improper financial and kickback arrangements with the owners, operators, and/or medical professionals that operated from

the Clinics, the Provider Defendants purported to subject virtually all Insureds to a series of medically unnecessary PfNCS tests.

157.    The Defendants billed the PfNCS tests to GEICO through the Provider Defendants as multiple charges under CPT codes 95999 and 95904.  Often, the Defendants billed GEICO for two PfNCS, one cervical PfNCS and one lumbar PfNCS, for an Insured on the same date of service, generally resulting in multiple charges totaling between $1019.62 - $2330.56 for each Insured on whom the PfNCS testing purportedly was performed.

158.    The Defendants purported to subject Insureds to PfNCS tests, supposedly to diagnose neuropathies or radiculopathies.

159.    As a threshold matter, the PfNCS tests were medically unnecessary because, for all the reasons discussed at length above, there is no legitimate medical evidence that PfNCS tests are useful in diagnosing any medical condition, let alone neuropathies or radiculopathies.

160.    The PfNCS tests were also medically unnecessary because Insureds who purportedly were subjected to Defendants' PfNCS tests also received NCVs, EMGs, and/or MRIs, services which are performed to properly diagnose neuropathies or radiculopathies.

161.    Even if the PfNCS tests purportedly provided by the Provider Defendants had any legitimate value in the diagnosis of neuropathies or radiculopathies, they were duplicative of the NCV tests, EMG tests, and/or MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the PfNCS tests that the Provider Defendants purported to provide.

162.    Though unsupported by any legitimate medical evidence, the alleged benefit of PfNCS tests is their supposed capability of diagnosing abnormalities in sensory nerves less than

14-21 days following an accident, which is sooner than NCV tests and EMG tests can be used to effectively diagnose axonal damage following an accident.

163.    Assuming that claim had substance (it does not), the Provider Defendants frequently purported to provide PfNCS tests to Insureds more than 21 days _after_ an Insured's accident, the point in time at which NCV and EMG tests can effectively diagnose nerve damage. For example:

(i)     Insured TS was involved in a motor vehicle accident on August 4, 2018. Despite the fact that NCV and EMG tests would have been effective, RF Chiro rendered medically unnecessary PfNCS testing on November 13, 2018, 101 days later;

(ii)    Insured MF was involved in a motor vehicle accident on June 5, 2019. Despite the fact that NCV and EMG tests would have been effective, Crosstown Chiro rendered medically unnecessary PfNCS testing on September 5, 2019, 92 days later;

(iii)   Insured CTB was involved in a motor vehicle accident on April 6, 2019. Despite the fact that NCV and EMG tests would have been effective, RAF Chiro rendered medically unnecessary PfNCS testing on June 17, 2019, 72 days later;

(iv)    Insured SC was involved in a motor vehicle accident on May 23, 2019. Despite the fact that NCV and EMG tests would have been effective, RAF Chiro rendered medically unnecessary PfNCS testing on July 8, 2019,  46 days later;

(v)     Insured SS was involved in a motor vehicle accident on November 23, 2019. Despite the fact that NCV and EMG tests would have been effective, RAF Chiro rendered medically unnecessary PfNCS testing on February 17, 2020, 86 days later;

(vi)    Insured MP was involved in a motor vehicle accident on April 6, 2019. Despite the fact that NCV and EMG tests would have been effective, South Shore Chiro rendered medically unnecessary PfNCS testing on June 4, 2019, 59 days later;

(vii)   Insured AM was involved in a motor vehicle accident on March 28, 2019. Despite the fact that NCV and EMG tests would have been effective, South Shore Chiro rendered medically unnecessary PfNCS testing on June 4, 2019, 68 days later.

> (viii)   Insured AB was involved in a motor vehicle accident on November 2, 2019. Despite the fact that NCV and EMG tests would have been effective, Healthy Big Apple Chiro rendered medically unnecessary PfNCS testing on August 19, 2020, 291 days later.
>
> (ix)   Insured DJM was involved in a motor vehicle accident on July 13, 2020. Despite the fact that NCV and EMG tests would have been effective, Fialkov, PC rendered medically unnecessary PfNCS testing on September 1, 2020, 50 days later.
>
> (x)   Insured JR was involved in a motor vehicle accident on July 18, 2020. Despite the fact that NCV and EMG tests would have been effective, Fialkov, PC rendered medically unnecessary PfNCS testing on September 1, 2020, 45 days later.

164.   Under the circumstances in which they were employed by the Defendants, the purported PfNCS tests were medically unnecessary.

165.   Further, Defendants often purported to provide PfNCS tests to Insureds after the Insureds had already received NCV and EMG tests, rendering those PfNCS tests wholly duplicative the moment they were allegedly performed. (Again, assuming PfNCS tests had any medical utility in diagnosing neuropathies, which they do not). For example:

> (i)   On August 14, 2018, Insured EC was purportedly subjected to EMG and NCV tests. Then, on September 17, 2018, 34 days later, RF Chiro purported to provide PfNCS tests to "EC".
>
> (ii)   On August 21, 2018, Insured CC was purportedly subjected to EMG and NCV tests. Then, on August 29, 2018, 8 days later, RF Chiro purported to provide PfNCS tests to "CC";
>
> (iii)   On July 16, 2019, Insured LD was purportedly subjected to EMG and NCV tests. Then, on August 22, 2019, 37 days later, Crosstown Chiro purported to provide PfNCS tests to "LD";
>
> (iv)   On October 2, 2019, Insured JM was purportedly subjected to EMG and NCV tests. Then, on October 3, 2019, 1 day later, Crosstown Chiro purported to provide PfNCS tests to "JM";

(v)     On May 21, 2019, Insured CTB was purportedly subjected to EMG and NCV tests. Then, on June 17, 2019, 28 days later, RAF Chiro purported to provide PfNCS tests to "CTB";

(vi)    On June 25, 2019, Insured SC was purportedly subjected to EMG and NCV tests. Then, on July 8, 2019 86 days later, RAF Chiro purported to provide PfNCS tests to "SC";

(vii)   On May 28, 2019, Insured JO was purportedly subjected to EMG and NCV tests. Then, on June 17, 2019, 14 days later, RAF Chiro purported to provide PfNCS tests to "JO";

(viii)  On May 21, 2019, Insured MP was purportedly subjected to EMG and NCV tests. Then, on June 4, 2019, 15 days later, South Shore purported to provide PfNCS tests to "MP";

(ix)    On June 4, 2020, Insured CI was purportedly subjected to EMG and NCV tests. Then, on July 14, 2020 41 days later, Big Apple Chiro purported to provide PfNCS tests to "CI"; and

(x)     On March 20, 2018, Insured MR was purportedly subjected to EMG and NCV tests. Then, on May 31, 2018, 73 days later, Fialkov, PC purported to provide PfNCS tests to "MR"

166.    Under the circumstances in which they were employed by Defendants, the purported PfNCS tests were medically unnecessary and duplicative of the NCV tests and EMG tests, both of which Insureds also received.

167.    Even assuming that there was some diagnostic value for PfNCS tests, which they do not, the PfNCS tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through NCVs, EMGs and/or MRIs.

168.    In keeping with the fact that the Provider Defendants' purported PfNCS tests were medically unnecessary and could not possibly have provided any additional diagnostic value, the putative "results" of the Defendants' PfNCS tests were not incorporated into any Insured's treatment plan, nor did the PfNCS tests play any genuine role in the treatment or care of the Insureds.

3.      **The Fraudulent Neuromuscular Re-Education Treatments**

169.    As set forth in Exhibits "3", "5", and "7", based upon the fraudulent pre-determined "diagnoses" provided during the initial chiropractic examinations, and the phony, pre-determined results of the electrodiagnostic tests, the Defendants purported to subject Insureds to many months of medically unnecessary in-office chiropractic treatments.

170.    The months of medically unnecessary in-office chiropractic treatments included billing that Defendants submitted or caused to be submitted for each Insured for "neuromuscular re-education."

171.    The Defendants billed for purported neuromuscular re-education under CPT code 97112, with charges ranging from $22.48 to $72.83, typically along with chiropractic manipulation treatment billed under CPT Codes 98940 and 98941.

172.    Neuromuscular re-education is used to re-educate and re-train a body part to perform a function/task that the body part absolutely was ready to do in its pre-injury state. This might include, for example, re-teaching the hand to twist a doorknob or grasp a cup.

173.    Broadly speaking, neuromuscular re-education is used following a neurological trauma such as a stroke.

174.    Neuromuscular re-education, most assuredly, is not medically necessary to treat muscle strains, sprains, soft tissue injuries, or injuries of a similar nature.

175.    Neuromuscular re-education may be considered medically necessary if at least one of the following conditions is present and documented:

- The Insured has the loss of deep tendon reflexes and vibration sense accompanied by paresthesia, burning, or diffuse pain of the feet, lower legs, and/or fingers; or

- The Insured has nerve palsy, such as peroneal nerve injury causing foot drop; or

- The Insured has muscular weakness of flaccidity as a result of a cerebral dysfunction, a nerve injury or disease, or has had a spinal cord disease or trauma.

176. Insureds purportedly treated by the Defendants did not present with any of the aforementioned prerequisites.

177. Despite this, the Defendants purportedly rendered neuromuscular re-education on Insureds they purportedly treated under the names of RAF Chiro, South Shore Chiro, and Fialkov.

178. Given the specific type of injury that neuromuscular re-education is meant to treat, there is no way that so many Insureds needed this treatment as a result of the relatively minor, fender-bender accidents that the Insureds purportedly got into.

179. Moreover, the Defendants submitted billing for purported neuromuscular re-education together with billing for standard chiropractic manipulations, in violation of the Fee Schedule. The Chiro Defendants did this repeatedly, despite the daily reimbursement limits applicable to CPT codes 97112 and 98940 and 98941, when these codes are billed for procedures and/or modalities performed on the same day.

180. Pursuant to the Fee Schedule, the Defendants are limited to a maximum reimbursement of 8 "relative value units" where neuromuscular re-education and chiropractic manipulations are performed on the same day, but the Defendants consistently submitted billing seeking in excess of the 8 relative value units per day, all in an effort to collect fees from GEICO and other New York automobile insurers over and above the maximum permissible charges allowable under the Fee Schedule.

181.    Even so, and as set forth in Exhibits "3", "4", and "7", the Defendants routinely purported to provide the Insureds with dozens of individual chiropractic treatments, spanning several months, despite the fact that the Insureds did not require them.

**D.    The Fraudulent Billing for Independent Contractor Services**

182.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors.

183.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

184.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI

Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

185.    Fialkov was the only healthcare service provider employed by the Provider Defendants and by his unincorporated chiropractic practice.

186.    Fialkov and the Provider Defendants "hired" the Treating Chiropractors to perform the Fraudulent Services at the Clinic Locations.

187.    In order to conceal payments made to the Treating Chiropractors, Fialkov caused funds to be electronically transferred from his corporate bank account, using "Zelle", to an account for the Treating Chiropractors.

188.    Zelle is a payment network which allows an account holder to electronically transfer funds to a recipient.  Once transferred, these funds are typically made available to the recipient in real time.

189.    Utilizing this payment option, Fialkov was able to pay the Treating Chiropractors for their work on a particular day at the Clinic. Such monies paid were not subject to tax or subject to any state or federal tax withholdings.

190.    Upon information and belief, Fialkov would then only report nominal payments on the Treating Chiropractor's W2 to create the appearance that the Treating Chiropractor was an employee, rather than an independent contractor.

191.    To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare services providers other than Fialkov were performed by chiropractors and unlicensed technicians whom Fialkov and Provider Defendants treated as independent contractors.

192.    For instance, Fialkov and the Provider Defendants:

(i)     paid the chiropractors and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the chiropractors and unlicensed technicians that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the chiropractors and unlicensed technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the chiropractors and unlicensed technicians;

(v)     failed to withhold federal, state or city taxes on behalf of the chiropractors and unlicensed technicians;

(vi)    compelled the chiropractors and unlicensed technicians to pay for their own malpractice insurance at their own expense;

(vii)   permitted the chiropractors and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii)  permitted the chiropractors and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the chiropractors and unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the chiropractors and unlicensed technicians were independent contractors.

193.    By electing to treat the chiropractors and unlicensed technicians as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

    (iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

    (v)     avoiding the need to secure any malpractice insurance; and

    (vi)     avoiding claims of agency-based liability arising from work performed by the chiropractors and unlicensed technicians.

194.    Because the chiropractors and unlicensed technicians were independent contractors and performed the Fraudulent Services, Fialkov and the Provider Defendants never had any right to bill for or collect PIP Benefits in connection with those services.

195.    Fialkov and the Provider Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement.

196.    Fialkov and the Provider Defendants misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

197.    In some cases, Fialkov and the Provider Defendants attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Fialkov on the billing as the treating provider, when in fact he did not provide the underlying treatments.

## IV.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

198.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms and treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

199.    The NF-3 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)      The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)     The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms and treatment reports submitted by and on behalf of Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickbacks paid for patient referrals.

(iv)    In many cases, the NF-3 forms and treatment reports submitted by and on behalf of the Defendants misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were not provided by the Provider Defendants' employees.

## V.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

200.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

201.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

202.    Specifically, they knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants unlawfully paid kickbacks for patient referrals.

203.    Additionally, the Defendants entered into complex financial arrangements with one another and with others that were designed to, and did, conceal that fact that the Provider Defendants unlawfully paid kickbacks in exchange for patient referrals.

204.    Furthermore, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent predetermined protocol designed to maximize the charges that could be submitted.

205.    The billing and supporting documentation submitted by the Defendants, when viewed in isolation, also does not reveal the fraudulent predetermined protocols employed.

206.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the Treating Chiropractors and unlicensed individuals with the Provider Defendants in order to prevent GEICO from discovering that the Treating Chiropractors  performing many of the Fraudulent Services – to the extent that they were performed at all – were not employed by the Provider Defendants. In many cases, the Defendants misrepresented the identity of the individual who purportedly performed the Fraudulent Services, or falsely claimed that the individuals providing the Fraudulent Services were employees of the Provider Defendants, in order to conceal the fact that the services were performed by independent contractors.

207.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

208.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

209.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across, numerous professional entities, and numerous different clinics located throughout the metropolitan area.

210.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them.

211.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against Fialkov and Provider Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

212.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

213.    There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $3,800,000.00 in fraudulent billing for the Fraudulent Services that has been

submitted to GEICO, including more than $1,000,000.00 in pending fraudulent billing from RF Chiro; more than $200,000.00 in pending fraudulent billing from South Shore Chiro; more than $300,000.00 in pending fraudulent billing from RAF Chiro; more than $1,800,000.00 in pending fraudulent billing from Crosstown Chiro; more than $100,000.00 in pending fraudulent billing from Healthy Big Apple Chiro; more than $400,000.00 in pending fraudulent billing from Fialkov, PC; and more than $80,000.00 in pending fraudulent billing submitted by the Unincorporated Fialkov Practice.

214.    Fialkov and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

215.    Fialkov and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

216.    Fialkov and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickbacks paid for patient referrals.

217.    Fialkov and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants' employees.

218.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Fialkov
### (Violation of RICO, 18 U.S.C. § 1962(c))

219.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

220.    Fialkov, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

221.    Fialkov knowingly conducted and/or participated, directly or indirectly, in the conduct of the Fialkov, PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Fialkov, PC was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Fialkov, PC obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Fialkov, PC's employees.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified

through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

222.   Fialkov, PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fialkov operated Fialkov, PC, insofar as Fialkov, PC is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Fialkov, PC to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Fialkov, PC to the present day.

223.   Fialkov, PC is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Fialkov, PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

224.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $88,000.00 pursuant to the fraudulent bills submitted by the Defendants through Fialkov, PC.

225.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Fialkov and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

226.  GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

227.  Fialkov, PC is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

228.  Fialkov and John Doe Defendants "1" – "10" are employed by or associated with the Fialkov, PC enterprise.

229.  Fialkov and John Doe Defendants "1" – "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Fialkov, PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Fialkov, PC was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Fialkov, PC obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Fialkov, PC's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity

identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

230.    Fialkov and John Doe Defendants "1" – "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

231.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $88,00.00 pursuant to the fraudulent bills submitted through Fialkov, PC.

232.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Fialkov and Fialkov, PC**
**(Common Law Fraud)**

233.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

234.    Fialkov and Fialkov, PC intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

235.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Fialkov, PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and

were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Fialkov and Fialkov, PC; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Fialkov, PC, when in fact many of the billed-for services were provided by independent contractors.

236.    Fialkov and Fialkov, PC intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Fialkov, PC that were not compensable under the New York no-fault insurance laws.

237.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $88,000.00 pursuant to the fraudulent bills submitted through Fialkov, PC.

238.    Fialkov and Fialkov, PC extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

239.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Against Fialkov and Fialkov, PC**
**(Unjust Enrichment)**

240.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

241.    As set forth above, Fialkov and Fialkov, PC have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

242.    When GEICO paid the bills and charges submitted by or on behalf of Fialkov, PC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Fialkov, PC and Fialkov's improper, unlawful, and/or unjust acts.

243.    Fialkov and Fialkov, PC have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Fialkov and Fialkov, PC voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

244.    Fialkov and Fialkov, PC retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

245.    By reason of the above, Fialkov and Fialkov, PC have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $88,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against John Doe Defendants "1" – "10"
### (Aiding and Abetting Fraud)

246.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

247.    John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Fialkov and Fialkov, PC.

248.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of Fialkov, PC and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

249.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Fialkov or Fialkov, PC to obtain payment from GEICO and other insurers.

250.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Fialkov and Fialkov, PC for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

251.    The conduct of John Doe Defendants "1" – "10" caused GEICO to pay more than $88,000.00 pursuant to the fraudulent bills submitted through Fialkov, PC.

252.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

253.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**Against Fialkov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

254.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

255.    RF Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

256.    Fialkov knowingly conducted and/or participated, directly or indirectly, in the conduct of the RF Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges since its inception seeking payments that RF Chiro was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) RF Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by RF Chiro's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

257.    RF Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fialkov operated RF Chiro insofar as RF Chiro is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for RF Chiro to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by RF Chiro to the present day.

258.     RF Chiro is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by RF Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

259.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $88,000.00 pursuant to the fraudulent bills submitted by the Defendants through RF Chiro.

260.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Fialkov and John Doe Defendants "1"–"10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

261.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

262.     RF Chiro is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

263.     Fialkov and John Doe Defendants "1"–"10" are employed by or associated with the RF Chiro enterprise.

264.     Fialkov and John Doe Defendants "1"–"10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of RF Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since its inception seeking payments that RF Chiro was

not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) RF Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by RF Chiro's employees. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

265.    Fialkov and John Doe Defendants "1"–"10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

266.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $88,000.00 pursuant to the fraudulent bills submitted through RF Chiro.

267.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
### Against Fialkov and RF Chiro
### (Common Law Fraud)

268.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

269.    Fialkov and RF Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

270.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that RF Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Fialkov and RF Chiro; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of  RF Chiro, when in fact many of the billed-for services were provided by independent contractors.

271.    Fialkov and RF Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through RF Chiro that were not compensable under the New York no-fault insurance laws.

272.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $88,000.00 pursuant to the fraudulent bills submitted through RF Chiro.

273.    Fialkov and RF Chiro extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

274.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against Fialkov and RF Chiro
### (Unjust Enrichment)

275.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

276.    As set forth above, Fialkov and RF Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

277.    When GEICO paid the bills and charges submitted by or on behalf of RF Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on RF Chiro and Fialkov's improper, unlawful, and/or unjust acts.

278.    Fialkov and RF Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Fialkov and RF Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

279.    Fialkov and RF Chiro retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

280.    By reason of the above, Fialkov and RF Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $88,000.00.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against John Doe Defendants "1"–"10"
### (Aiding and Abetting Fraud)

281.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

282.   John Doe Defendants "1"-"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Fialkov and RF Chiro.

283.   The acts of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of RF Chiro and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

284.   The conduct of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1"–"10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Fialkov or RF Chiro to obtain payment from GEICO and other insurers.

285.   John Doe Defendants "1"–"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Fialkov and RF Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

286.   The conduct of John Doe Defendants "1"–"10" caused GEICO to pay more than $88,000.00 pursuant to the fraudulent bills submitted through RF Chiro.

287.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

288.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### Against Fialkov
### (Violation of RICO, 18 U.S.C. § 1962(c))

289.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

290.     South Shore Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

291.     Fialkov knowingly conducted and/or participated, directly or indirectly, in the conduct of the South Shore Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that South Shore Chiro was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) South Shore Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors,

rather than by South Shore Chiro's employees.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

292.    South Shore Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fialkov operated South Shore Chiro, insofar as South Shore Chiro is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for South Shore Chiro to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by South Shore Chiro to the present day.

293.    South Shore Chiro is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by South Shore Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

294.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted by the Defendants through South Shore Chiro.

295.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Against Fialkov and John Doe Defendants "1"–"10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

296.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

297.    South Shore Chiro is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

298.    Fialkov and John Doe Defendants "1"–"10" are employed by or associated with the South Shore Chiro enterprise.

299.    Fialkov and John Doe Defendants "1"–"10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of South Shore Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that South Shore Chiro was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) South Shore Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by South Shore Chiro's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the

pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

300. Fialkov and John Doe Defendants "1"–"10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

301. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted through South Shore Chiro.

302. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTEENTH CAUSE OF ACTION**
**Against Fialkov and South Shore Chiro**
**(Common Law Fraud)**

303. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

304. Fialkov and South Shore Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

305. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that South Shore Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for

services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Fialkov and South Shore Chiro; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of South Shore Chiro, when in fact many of the billed-for services were provided by independent contractors.

306. Fialkov and South Shore Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through South Shore Chiro that were not compensable under the New York no-fault insurance laws.

307. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted through South Shore Chiro.

308. Fialkov and South Shore Chiro's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

309. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### Against Fialkov and South Shore Chiro
### (Unjust Enrichment)

310.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

311.    As set forth above, Fialkov and South Shore Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

312.    When GEICO paid the bills and charges submitted by or on behalf of South Shore Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on South Shore Chiro and Fialkov's improper, unlawful, and/or unjust acts.

313.    Fialkov and South Shore Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Fialkov and South Shore Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

314.    Fialkov and South Shore Chiro's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

315.    By reason of the above, Fialkov and South Shore Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $94,000.00.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### Against John Doe Defendants "1"–"10"
### (Aiding and Abetting Fraud)

316.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

317.    John Doe Defendants "1"–"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Fialkov and South Shore Chiro.

318.    The acts of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of South Shore Chiro and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

319.    The conduct of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1"–"10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Fialkov or South Shore Chiro to obtain payment from GEICO and other insurers.

320.    John Doe Defendants "1"–"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Fialkov and South Shore Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

321.    The conduct of John Doe Defendants "1"–"10" caused GEICO to pay more than $94,000.00 pursuant to the fraudulent bills submitted through South Shore Chiro.

322.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

323.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### Against Fialkov
### (Violation of RICO, 18 U.S.C. § 1962(c))

324.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

325.    Crosstown Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

326.    Fialkov knowingly conducted and/or participated, directly or indirectly, in the conduct of the Crosstown Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Crosstown Chiro was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Crosstown Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Crosstown Chiro's employees.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

327.    Crosstown Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fialkov operated Crosstown Chiro, insofar as Crosstown Chiro is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Crosstown Chiro to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Crosstown Chiro to the present day.

328.    Crosstown Chiro is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Crosstown Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

329.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $57,000.00 pursuant to the fraudulent bills submitted by the Defendants through Crosstown Chiro.

330.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**<u>AS AND FOR AN EIGHTEENTH CAUSE OF ACTION</u>**
**Against Fialkov and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

331.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

332.     Crosstown Chiro is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

333.     Fialkov and John Doe Defendants "1"–"10" are employed by or associated with the Crosstown Chiro enterprise.

334.     Fialkov and John Doe Defendants "1"–"10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of  Crosstown Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since its inception seeking payments that Crosstown Chiro was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Crosstown Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Crosstown Chiro's employees. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

335.     Fialkov and John Doe Defendants "1"–"10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

336.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $57,000.00 pursuant to the fraudulent bills submitted through Crosstown Chiro.

337.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A NINETEENTH CAUSE OF ACTION**
**Against Fialkov and Crosstown Chiro**
**(Common Law Fraud)**

338.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

339.    Fialkov and Crosstown Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

340.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Crosstown Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Crosstown Chiro; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the

representation that the billed-for services were provided by employees of  Crosstown Chiro, when in fact many of the billed-for services were provided by independent contractors.

341.    Fialkov and Crosstown Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Crosstown Chiro that were not compensable under the New York no-fault insurance laws.

342.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $57,000.00 pursuant to the fraudulent bills submitted through Crosstown Chiro.

343.    Fialkov and Crosstown Chiro extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

344.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
### Against Fialkov and Crosstown Chiro
### (Unjust Enrichment)

345.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

346.    As set forth above, Fialkov and Crosstown Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

347.    When GEICO paid the bills and charges submitted by or on behalf of Crosstown Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Crosstown Chiro and Crosstown Chiro's improper, unlawful, and/or unjust acts.

348.    Fialkov and Fialkov, PC have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Fialkov and Crosstown Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

349.    Fialkov and Crosstown Chiro retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

350.    By reason of the above, Fialkov and Crosstown Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $57,000.00.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
**Against John Doe Defendants "1"–"10"**
**(Aiding and Abetting Fraud)**

351.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

352.    John Doe Defendants "1"–"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Fialkov and Crosstown Chiro.

353.    The acts of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of Crosstown Chiro  and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

354.    The conduct of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1"–"10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Fialkov or Crosstown Chiro to obtain payment from GEICO and other insurers.

355. John Doe Defendants "1"–"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Crosstown Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

356. The conduct of John Doe Defendants "1"–"10" caused GEICO to pay more than $57,000.00 pursuant to the fraudulent bills submitted through Crosstown Chiro.

357. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

358. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
**Against Fialkov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

359. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

360. RAF Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

361. Fialkov knowingly conducted and/or participated, directly or indirectly, in the conduct of the RAF Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that RAF Chiro was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-

for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) RAF Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by RAF Chiro employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

362. RAF Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fialkov operated RAF Chiro, insofar as RAF Chiro is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for RAF Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by RAF Chiro to the present day.

363. RAF Chiro is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by RAF Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

364.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $181,000.00 pursuant to the fraudulent bills submitted by the Defendants through RAF Chiro.

365.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
### Against Fialkov and John Doe Defendants "1"–"10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

366.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

367.    RAF Chiro is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

368.    Fialkov and John Doe Defendants "1"–"10" are employed by or associated with the Fialkov, PC enterprise.

369.    Fialkov and John Doe Defendants "1"–"10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of RAF Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that RAF Chiro was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated

the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) RAF Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by RAF Chiro's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

370.   Fialkov and John Doe Defendants "1"–"10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

371.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $181,000.00 pursuant to the fraudulent bills submitted through RAF Chiro.

372.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION**
**Against Fialkov and RAF Chiro**
**(Common Law Fraud)**

373.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

374.   Fialkov and RAF Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

375.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that RAF Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Fialkov and RAF Chiro; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of RAF Chiro, when in fact many of the billed-for services were provided by independent contractors.

376.    Fialkov and RAF Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through RAF Chiro that were not compensable under the New York no-fault insurance laws.

377.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $181,000.00 pursuant to the fraudulent bills submitted through RAF Chiro.

378.    Fialkov and RAF Chiro extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

379.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION
### Against Fialkov and RAF Chiro
### (Unjust Enrichment)

380.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

381.     As set forth above, Fialkov and RAF Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

382.     When GEICO paid the bills and charges submitted by or on behalf of RAF Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Fialkov, PC and RAF Chiro improper, unlawful, and/or unjust acts.

383.     Fialkov and RAF Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Fialkov and RAF Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

384.     Fialkov and RAF Chiro retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

385.     By reason of the above, Fialkov and RAF Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $181,000.00.

## AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION
### Against John Doe Defendants "1"–"10"
### (Aiding and Abetting Fraud)

386.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

387.    John Doe Defendants "1"–"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Fialkov and RAF Chiro.

388.    The acts of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of RAF Chiro and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

389.    The conduct of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1"–"10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Fialkov or RAF Chiro to obtain payment from GEICO and other insurers.

390.    John Doe Defendants "1"–"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Fialkov and RAF Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

391.    The conduct of John Doe Defendants "1"–"10" caused GEICO to pay more than $181,000.00 pursuant to the fraudulent bills submitted through RAF Chiro.

392.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

393.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-SEVENTH CAUSE OF ACTION
### Against Fialkov
### (Violation of RICO, 18 U.S.C. § 1962(c))

394.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

395.    Healthy Big Apple Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

396.    Fialkov knowingly conducted and/or participated, directly or indirectly, in the conduct of the Healthy Big Apple Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Healthy Big Apple Chiro was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Healthy Big Apple Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Healthy Big Apple Chiro's employees.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

397.    Healthy Big Apple Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fialkov operated Healthy Big Apple Chiro insofar as Healthy Big Apple Chiro is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Healthy Big Apple Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Healthy Big Apple Chiro to the present day.

398.    Healthy Big Apple Chiro is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Healthy Big Apple Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

399.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $51,000.00 pursuant to the fraudulent bills submitted by the Defendants through Healthy Big Apple Chiro.

400.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-EIGHTH CAUSE OF ACTION
**Against Fialkov and John Doe Defendants "1"–"10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

401.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

402.    Healthy Big Apple Chiro is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

403.    Fialkov and John Doe Defendants "1"–"10" are employed by or associated with the Healthy Big Apple Chiro enterprise.

404.    Fialkov and John Doe Defendants "1"–"10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of  Healthy Big Apple Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since its inception seeking payments that Healthy Big Apple Chiro was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Healthy Big Apple Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Healthy Big Apple Chiro's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

405.    Fialkov and John Doe Defendants "1"–"10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

406.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $51,000.00 pursuant to the fraudulent bills submitted through Healthy Big Apple Chiro.

407.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-NINTH CAUSE OF ACTION
### Against Fialkov and Healthy Big Apple Chiro
### (Common Law Fraud)

408.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

409.    Fialkov and Healthy Big Apple Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

410.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Fialkov, PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Fialkov and Healthy Big Apple Chiro; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that

purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Healthy Big Apple Chiro, when in fact many of the billed-for services were provided by independent contractors.

411.    Fialkov and Healthy Big Apple Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Healthy Big Apple Chiro that were not compensable under the New York no-fault insurance laws.

412.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $51,000.00 pursuant to the fraudulent bills submitted through Healthy Big Apple Chiro.

413.    Fialkov and Healthy Big Apple Chiro extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

414.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTIETH CAUSE OF ACTION
**Against Fialkov and Healthy Big Apple Chiro**
**(Unjust Enrichment)**

415.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

416.    As set forth above, Fialkov and Healthy Big Apple Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

417.     When GEICO paid the bills and charges submitted by or on behalf of Healthy Big Apple Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Healthy Big Apple Chiro and Fialkov's improper, unlawful, and/or unjust acts.

418.     Fialkov and Healthy Big Apple Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Fialkov and Healthy Big Apple Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

419.     Fialkov and Healthy Big Apple Chiro retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

420.     By reason of the above, Fialkov and Healthy Big Apple Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $51,000.00.

### AS AND FOR A THIRTY-FIRST CAUSE OF ACTION
### Against John Doe Defendants "1"–"10"
### (Aiding and Abetting Fraud)

421.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

422.     John Doe Defendants "1"–"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Fialkov and Healthy Big Apple Chiro.

423.     The acts of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of Healthy Big Apple Chiro and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

424.     The conduct of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme was significant and material.   The conduct of John Doe Defendants "1"–"10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Fialkov or Healthy Big Apple Chiro to obtain payment from GEICO and other insurers.

425.     John Doe Defendants "1"–"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Fialkov and Healthy Big Apple Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

426.     The conduct of John Doe Defendants "1"–"10" caused GEICO to pay more than $51,000.00 pursuant to the fraudulent bills submitted through Healthy Big Apple Chiro.

427.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

428.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTY-SECOND CAUSE OF ACTION
**Against Fialkov**
**(Common Law Fraud)**

429.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

430.     Fialkov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

431.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Unincorporated Fialkov Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Fialkov and the Unincorporated Fialkov Practice; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of  the Unincorporated Fialkov Practice, when in fact many of the billed-for services were provided by independent contractors.

432.    Fialkov and the Unincorporated Fialkov Practice intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Unincorporated Fialkov Practice that were not compensable under the New York no-fault insurance laws.

433.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $51,000.00 pursuant to the fraudulent bills submitted through the Unincorporated Fialkov Practice. The fraudulent bills and corresponding mailings submitted to GEICO identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "7".

434.    Fialkov and the Unincorporated Fialkov Practice's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

435.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTY-THIRD OF ACTION
**Against Fialkov**
**(Unjust Enrichment)**

436.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

437.    As set forth above, Fialkov and the Unincorporated Fialkov Practice have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

438.    When GEICO paid the bills and charges submitted by or on behalf of the Unincorporated Fialkov Practice for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Unincorporated Fialkov Practice and Fialkov's improper, unlawful, and/or unjust acts.

439.    Fialkov and the Unincorporated Fialkov Practice have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Fialkov and the Unincorporated Fialkov Practice voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

440.    Fialkov and the Unincorporated Fialkov Practice retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

441.    By reason of the above, Fialkov and the Unincorporated Fialkov Practice have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $51,000.00.

## AS AND FOR A THIRTY-FOURTH CAUSE OF ACTION
### Against John Doe Defendants "1"–"10"
### (Aiding and Abetting Fraud)

442.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

443.    John Doe Defendants "1"–"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Fialkov and the Unincorporated Fialkov Practice.

444.    The acts of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of the Unincorporated Fialkov Practice and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

445.    The conduct of John Doe Defendants "1"–"10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1"–"10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Fialkov or the Unincorporated Fialkov Practice to obtain payment from GEICO and other insurers.

446.    John Doe Defendants "1"–"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Fialkov and the Unincorporated Fialkov Practice for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

447.    The conduct of John Doe Defendants "1"–"10" caused GEICO to pay more than $51,000.00 pursuant to the fraudulent bills submitted through the Unincorporated Fialkov Practice.

448.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

449.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-FIFTH CAUSE OF ACTION
**Against Fialkov and John Doe Defendants "1"–"10"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

450.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

451.    Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro, the Unincorporated Fialkov Practice, and Healthy Big Apple Chiro constitute an association-in-fact "enterprise" (the "Fialkov Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Fialkov Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro, the Unincorporated Fialkov Practice and Healthy Big Apple Chiro are independent entities – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other insurers. The Fialkov Fraud Enterprise has been operated under several separate corporate names in order to reduce the number

of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Fialkov Fraud Enterprise acting individually or without the aid of each other.

452.    The Fialkov Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various financial arrangements and contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, by facilitating payments for patient referrals, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

453.    Fialkov and John Doe Defendants "1"–"10" were employed by and/or associated with the Fialkov Fraud Enterprise.

454.    Fialkov and John Doe Defendants "1"–"10" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Fialkov Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three and one-half years seeking

payments for healthcare services they were not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) patient referrals were obtained through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by actual employees of the billing entities.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "7".

455.    The Fialkov Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fialkov and John Doe Defendants "1"–"10" operated the Fialkov Fraud Enterprise, inasmuch as Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro, the Unincorporated Fialkov Practice and Healthy Big Apple Chiro never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Fialkov Fraud Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro, the Unincorporated Fialkov Practice and Healthy Big Apple Chiro to the present day.

456. The Fialkov Fraud Enterprise is engaged in inherently unlawful acts, inasmuch as Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro, the Unincorporated Fialkov Practice and Healthy Big Apple Chiro were in violation of material licensing requirements by providing, or purporting to provide, healthcare services pursuant to pre-determined fraudulent protocols solely to maximize profits  without regard for genuine patient care, accomplished through kickback payments made for patient referrals, and their existence therefore has depended on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. The Fialkov Fraud Enterprise likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Fialkov Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

457. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $612,000.00 pursuant to the fraudulent bills submitted by the Defendants through Provider Defendants Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro, the Unincorporated Fialkov Practice and Healthy Big Apple Chiro.

458. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-SIXTH CAUSE OF ACTION
**Against Fialkov and John Doe Defendants "1"–"10"**
**(Violation of RICO, 18 U.S.C. § 1962(d)**

459. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above

460.     Fialkov  and John Doe Defendants "1"–"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Fialkov Fraud Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to GEICO.  These acts of mail fraud include, but are not limited to, those that are described in the charts annexed hereto as Exhibits "1" – "7".  Each member of the Fialkov Fraud Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

461.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $612,000.00 pursuant to the fraudulent bills submitted by the Defendants through Provider Defendants Fialkov, PC, RF Chiro, South Shore Chiro, Crosstown Chiro, RAF Chiro, the Unincorporated Fialkov Practice, and Healthy Big Apple Chiro.

462.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

463.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty+ Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Fialkov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $88,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Fialkov and John Doe Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $88,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Fialkov and Fialkov, PC, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $88,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Fialkov and Fialkov, PC, more than $88,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against John Doe Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $88,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.    On the Seventh Cause of Action against Fialkov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $88,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.    On the Eighth Cause of Action against Fialkov and John Doe Defendants "1"– "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $88,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.    On the Ninth Cause of Action against Fialkov and RF Chiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $88,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.    On the Tenth Cause of Action against Fialkov and RF Chiro, more than $88,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

K.    On the Eleventh Cause of Action against John Doe Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $88,000.00  together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

L.    On the Twelfth Cause of Action against Fialkov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $94,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.    On the Thirteenth Cause of Action against Fialkov and John Doe Defendants "1"– "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in

excess of $94,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Fialkov and South Shore Chiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $94,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Fialkov and South Shore Chiro, more than $94,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against John Joe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $94,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Fialkov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $57,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Fialkov and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $57,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Fialkov and Crosstown Chiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$57,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  T. On the Twentieth Cause of Action against Fialkov and Crosstown Chiro, more than $57,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

  U. On the Twenty-First Cause of Action against John Doe Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $57,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

  V. On the Twenty-Second Cause of Action against Fialkov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $181,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  W. On the Twenty-Third Cause of Action against Fialkov and Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $181,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  X. On the Twenty-Fourth Cause of Action against Fialkov and RAF Chiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $181,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  Y. On the Twenty-Fifth Cause of Action against Fialkov and RAF Chiro, more than $181,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.      On the Twenty-Sixth Cause of Action against John Doe Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $181,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

AA.     On the Twenty-Seventh Cause of Action against Fialkov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.     On the Twenty-Eighth Cause of Action against Fialkov and Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.     On the Twenty-Ninth Cause of Action against Fialkov and Healthy Big Apple Chiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $51,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

DD.     On the Thirtieth Cause of Action against Fialkov and Healthy Big Apple Chiro, more than $51,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

EE.     On the Thirty-First Cause of Action against John Doe Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

FF.     On the Thirty-Second Cause of Action against Fialkov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $51,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

GG.     On the Thirty-Third Cause of Action against Fialkov, more than $51,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper; and

HH.     On the Thirty-Fourth of Action against John Doe Defendants "1"–"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

II.     On the Thirty-Fifth Cause of Action against Fialkov  and John Doe Defendants "1"–"10" compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $612,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

JJ.     On the Thirty-Sixth Cause of Action against Fialkov  and John Doe Defendants "1"–"10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $612,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: Uniondale, New York
　　　　July 19, 2021

　　　　　　　　　　　　　　　RIVKIN RADLER LLP

　　　　　　　　　　　　　　　By:　 /s/ *Michael A. Sirignano*　　　　　　
　　　　　　　　　　　　　　　　　　 Barry I. Levy, Esq.
　　　　　　　　　　　　　　　　　　 Michael A. Sirignano, Esq.
　　　　　　　　　　　　　　　　　　 Frank Tiscione, Esq.

Melissa D. Medilien, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*